In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 24-2908

SAM INENDINO,

*Plaintiff-Appellant,*

*v.*

ANNETTE NANCE-HOLT, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-04982 — **Matthew F. Kennelly**, *Judge.*

———————————

ARGUED SEPTEMBER 18, 2025 — DECIDED JULY 16, 2026

———————————

Before RIPPLE, LEE, and PRYOR, *Circuit Judges.*

LEE, *Circuit Judge.* For sixteen years, Sam Inendino worked
as a firefighter for the Chicago Fire Department ("CFD"). He
was fired following a workplace investigation into his public
Facebook account, which contained several racially charged
and offensive posts. Inendino sued Fire Commissioner An-
nette Nance-Holt, CFD Assistant Commissioner of Labor Re-
lations Brian Casey, and the City of Chicago (we will refer to
them collectively as "the City") under 42 U.S.C. § 1983, alleg-

ing that the City's actions violated his First Amendment rights. The district court granted the City's motion for summary judgment, holding that Inendino's Facebook posts were not protected under the First Amendment because they did not touch on matters of public concern. Alternatively, the district court held that, even if the posts touch on matters of public concern, the City's interest in efficiency and maintaining the public trust outweighed Inendino's free speech interest under the balancing test articulated in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563, 568 (1968).

Although the district court erred in its analysis of whether Inendino's posts touched on matters of public concern, we agree that the City nevertheless prevails under *Pickering* and affirm.

# I

## Background

### A. Inendino's Employment

Inendino worked as a firefighter and emergency medical technician ("EMT") with the CFD from May 2005 to June 2021. He typically worked out of Engine 54 in Englewood, a predominantly Black neighborhood in Chicago, and frequently interacted with the public. As an EMT, he also responded to medical calls and engaged directly with patients.

Like many, Inendino had a Facebook page. During the relevant period, his Facebook page was public, which means that any member of the public could view its content.

Inendino prominently identified himself as a CFD firefighter on his Facebook page. His profile picture depicted him

sitting on the back of a fire truck with his son wearing firefighter gear. His profile picture was visible to anyone who visited his Facebook page and appeared next to every Facebook comment or post he made. His Facebook page also contained numerous other photographs indicating that he was a CFD firefighter. Inendino did not post a disclaimer on his Facebook page stating that his posts reflected solely his views and were not those of CFD. Below is a screenshot of Inendino's Facebook page at the time:



Dkt. 132-3 at 3.

On October 29, 2019, the Chicago Office of Inspector General ("OIG") received a complaint from a member of the public concerning a Facebook comment made by Inendino in which he told individuals to "take your ass back over the border where ya belong … gotta go I have a real job." Dkt. 134 ¶ 74.

Two days later, OIG received a second complaint from a different member of the public regarding another comment Inendino posted on Facebook. The complainant had posted

on Facebook a video her daughter had filmed showing a Chicago Police Department lieutenant purportedly assaulting her 16-year-old son. Inendino posted a comment on the video, stating that Inendino had to "go to work to pay for all your scumbag kids that you welfare fucks keep having." *Id.*

In response to the complaints, OIG investigated Inendino's Facebook page and prepared a twenty-seven-page summary report of its findings ("OIG Report"). After discussing thirteen of Inendino's Facebook posts made between April and October 2020, the OIG Report found that the posts targeted Black and Asian Americans, both groups that CFD serves. It also highlighted Inendino's assignment in Englewood, a predominantly Black neighborhood and the City's "interest in ensuring trust in its services by its citizens." Dkt. 123-1 at 28.

The OIG Report concluded:

Inendino's racist and offensive Facebook posts show a contempt for the residents of the community he serves. Any minority resident of the City, who was exposed to the content on Inendino's public Facebook page, could reasonably question whether he would deliver the appropriate level of care were they to need his services as an EMT.

*Id.* at 28–29.

The report ultimately recommended that the City terminate Inendino's employment. On May 4, 2021, after reviewing the report, CFD Assistant Commissioner of Labor Relations Brian Casey recommended to Fire Commissioner Annette Nance-Holt that she adopt the recommendation.

The next day, Commissioner Nance-Holt informed the Inspector General that she agreed with the recommendation to fire Inendino. On June 7, 2021, Inendino was notified that his employment was terminated effective June 9, 2021. In the termination letter, the City informed him that his firing was pursuant to City of Chicago Personnel Rule XVIII, Section 2.01 of CFD's Code of Professional Conduct, Social Media/Social Networking Policy General Order 17-001, and General Order 20-002.[1]

---

[1] City of Chicago Personnel Rule XVIII provides that an employee will be disciplined and potentially discharged for "[d]iscourteous treatment, including verbal abuse, of any … member of the public," "[p]rovoking or inciting another employee or member of the public to engage in such conduct," or "[v]iolating any departmental regulations, rules, or procedures." Dkt. 123-13 at 5, 7.

Section 2.01 of CFD's Code of Professional Conduct provides that an employee shall be disciplined and potentially discharged for "[c]onduct in violation of the Code of Professional Conduct," which includes violation of Personnel Code Rule XVIII. Dkt. 123-14 at 9.

Social Media/Social Networking Policy General Order 17-001, which was effective until mid-September 2020, provides that "[i]nappropriate remarks [on social media] will not be tolerated and may result in disciplinary action up to and including termination." Dkt. 123-15 at 2. The Order prohibits "any content … that can be deemed offensive" such as offensive content "based on race, ethnic heritage, national origin, sex, … housing status, [or] religion." *Id.* at 3.

General Order 20-002, which came into effect after Order 17-001, requires that when posting online, a CFD employee "must work hard to gain the trust and confidence of the community they serve. … [and] give thoughtful consideration to their actions to avoid damaging the reputation and trust the [CFD] has with the community." Dkt. 123-16 at 2. To this end, an employee may "express themselves as private citizens in matters

Inendino subsequently arbitrated a grievance challenging his dismissal as permitted by his union's collective bargaining agreement. On May 13, 2022, the arbitrator upheld the dismissal, finding just cause for the termination.

**B. Proceedings Below**

Inendino sued the City under 42 U.S.C. § 1983, claiming that Nance-Holt and Casey had fired him in violation of the First Amendment, and that the City's policy of prohibiting posts that "can be deemed offensive" was unconstitutionally vague and overbroad, Dkt. 43 ¶¶ 57–63. After discovery, the City filed a motion for summary judgment, which the district court granted. Inendino limits his appeal to the following two questions: whether the Facebook posts in question touch on matters of public concern, and whether the First Amendment test the Supreme Court established in *Pickering* favors the City.[2]

---

of public concern," but only if his or her speech does not (1) "[i]nterfere with CFD operations or impair working relationships of the Department;" (2) "[i]mpede the performance of job duties;" (3) "[u]ndermine the goals and mission of the Department;" (4) "[u]ndermine public trust or confidence in the Department;" (5) "[d]iscriminate based on race, … national origin, sex, … housing status, religion;" or (6) "[c]onstitute harassment or bullying." *Id.* at 3.

[2] Inendino addressed his *Monell* claim against the City for the first time in his reply brief. By doing so, Inendino has waived his argument that the district court erred in granting summary judgment in the City's favor as to his *Monell* claim. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond.").

## II

### Discussion

We review the district court's grant of summary judgment *de novo*. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 150 F.4th 792, 804 (7th Cir. 2025) (citing *McDaniel v. Syed*, 115 F.4th 805, 821–22 (7th Cir. 2024)). Summary judgment is granted "when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). When determining whether a material factual dispute exists, we "construe all facts and draw all reasonable inferences in a light most favorable to the non-moving party." *Biggs v. Chi. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023) (quoting *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017)).

The First Amendment, as made applicable to the States by the Fourteenth Amendment, prohibits state actors from "abridging the freedom of speech." U.S. Const. amends. I, XIV. "As a general matter, protecting the public's interest in having citizens speak about and debate matters of public concern 'lies at the heart of the First Amendment.'" *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 900 (7th Cir. 2024) (quoting *Lane v. Franks*, 573 U.S. 228, 236 (2014)).

That said, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Thus, "the government, as employer, has greater leeway to control the speech of its employees to ensure discipline and harmony in government operation." *Hicks*, 109 F.4th at 900 (citing *Waters v. Churchill*, 511 U.S. 661,

671–72 (1994)). The upshot is, although "[p]ublic employees do not sign away their free speech rights when answering the call to public service," *id.* (citing *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)), they "must accept certain limitations on [their] freedom," *Garcetti*, 547 U.S. at 418.

Striking this balance, the Supreme Court has held that the "First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected [speech]." *Heffernan v. City of Paterson*, 578 U.S. 266, 268 (2016). This general rule can be overcome if the government employer shows that its interest in efficiency outweighs the employee's speech interests. *See Pickering*, 391 U.S. at 568.

Whether speech is constitutionally protected "is a question of law." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002) (*Gustafson II*). Nonetheless, the analysis may require certain "predicate factual determinations" to be made. *Id.*

Here, Inendino contends that his Facebook posts constitute protected speech and that the City improperly terminated him in retaliation for posting them. As a public employee, his First Amendment retaliation claim is governed by the framework laid out in *Mount Healthy Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

Under this framework, the public employee first must establish a *prima facie* case of First Amendment retaliation by showing (1) that his speech was constitutionally protected; (2) that he suffered a deprivation likely to deter free speech; and (3) that his speech was at least a motivating factor in the employer's actions. *Hedgepeth v. Britton*, 152 F.4th 789, 795 (7th

Cir. 2025) (citing *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019)).

If the employee satisfies this requirement, the burden shifts to the public employer to produce evidence that it would have fired the employee even in the absence of the protected speech. *Kingman v. Frederickson*, 40 F.4th 597, 601–02 (7th Cir. 2022) (citing *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006)) ("In other words, the defendants may show that retaliation was *not* the but-for cause for the firing."); *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 313–14 (7th Cir. 2017) (explaining that if the employee makes an initial showing of retaliatory motive, the burden shifts to the defendants "to provide a legitimate and nonretaliatory explanation for the firing").

Once the public employer carries that burden, the burden shifts back to the employee to persuade the factfinder that the employer's proffered reasons for the termination are pretextual. *Kingman*, 40 F.4th at 602 (citing *McGreal*, 850 F.3d at 314).

The issue before us in this appeal is narrow and asks whether Inendino has established the first element of a *prima facie* claim under *Mt. Healthy*. (The City agrees that he has satisfied the other two.) In other words, we must decide whether Inendino's thirteen Facebook posts constituted speech protected by the First Amendment.

Making this determination, as we have noted, requires us to apply the Supreme Court's holding in *Pickering* and balance the government employer's interest in efficiency against the employee's speech interests. 391 U.S. at 568. But before we get

there, we must answer several prefatory questions about the nature of the employee's speech.

Where the public employee can show that the speech in question is made outside the workplace, involves content largely unrelated to public employment, and is addressed to a public audience, we look to the Supreme Court's discussion in *United States v. National Treasury Employees Union*, 513 U.S. 454, 466 (1995) ("*NTEU*"). *See San Diego*, 543 U.S. at 80–81; *Harnishfeger*, 943 F.3d at 1113. Under *NTEU*, if the employee makes this showing, the speech enjoys full First Amendment protections, unless the employer can demonstrate that the employee deliberately linked the speech to the employer's mission, purpose, or image. *See San Diego*, 543 U.S. at 81; Cynthia Estlund, *Free Speech Rights That Work at Work: From the First Amendment to Due Process*, 54 UCLA L. Rev. 1464, 1467–68 (2007). If the employer succeeds in doing this, the parties proceed to *Pickering* balancing, where we balance "the employee's interest in commenting on matters of public concern against the government employer's interest 'in promoting the efficiency of the public services.'" *Hedgepeth*, 152 F.4th at 795 (quoting *Pickering*, 391 U.S. at 568).[3]

If *NTEU* does not apply to the speech in question, we turn to the Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138 (1983). *See San Diego*, 543 U.S. at 81–82. Under *Connick*, we ask "whether the employee is speaking as a citizen on a matter of public concern." *Kilborn v. Amiridis*, 131 F.4th 550, 557 (7th

---

[3] Cases in this category typically involve challenges to a public employer's *ex ante* restriction on an employee's outside speech. *See NTEU*, 513 U.S. at 481 (O'Connor, J., concurring); *Hicks*, 109 F.4th at 901.

Cir. 2025) (citing *Connick*, 461 U.S. at 147).[4] If the answer is in the affirmative, we move to *Pickering* balancing.

## A. *Connick*: Matter of Public Concern

Inendino relies heavily on *NTEU*, but because he identified himself as a Chicago firefighter on Facebook and challenges the City's basis for firing him *post hoc*, the more natural course is to proceed under *Connick*. *See San Diego*, 543 U.S. at 82; *Hicks*, 109 F.4th at 901. And so, we consider whether he was "speaking as a citizen on a matter of public concern" when he created the thirteen Facebook posts. *Kilborn*, 131 F.4th at 557 (citing *Connick*, 461 U.S. at 147). And, because the parties agree that Inendino was speaking as a citizen at the time, we focus on whether his posts touched on matters of public concern.

This is a question of law, *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013), and the test casts a wide net. In the Supreme Court's words, speech touches on matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting in turn *Connick*, 461 U.S. at 146, and *San Diego*, 543 U.S. at 83–84). Put another way, "[s]peech involves a matter of public concern when it addresses subjects of general interest that

---

[4] Cases applying *Connick* typically involve a public employer's *post-hoc* punishment of an employee's speech. *NTEU*, 513 U.S. at 481 (O'Connor, J., concurring); *Hicks*, 109 F.4th at 901.

may be of value or concern to the broader public." *Kilborn*, 131
F.4th at 559 (citing *Lane*, 573 U.S. at 241). "This category of
speech is not limited to 'matters of transcendent importance,'
but also includes 'matters in which the public might be inter-
ested, as distinct from wholly personal grievances.'" *Id.* (quot-
ing *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir.
1996)).

In conducting this analysis, we must "evaluate all the cir-
cumstances of the speech, including what was said, where it
was said, and how it was said." *Snyder*, 562 U.S. at 454. Our
goal is to "look[] to the overall *objective* or *point* of the speech,
as ascertained by *all three* factors of content, form, and con-
text." *Kristofek*, 712 F.3d at 985 (citing *Connick*, 461 U.S. at 138).
Moreover, although content is "the most important factor," *id.*
at 984 (citing *Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir.
2009)), no single factor is dispositive, *Kilborn*, 131 F.4th at 559.

In this case, the district court's analysis suffered from four
missteps. First, it failed to examine "each [speech] incident
separately to determine whether any touched on a matter of
public concern." *Kuchenreuther v. City of Milwaukee*, 221 F.3d
967, 973 (7th Cir. 2000); *see Gray v. Lacke*, 885 F.2d 399, 411 (7th
Cir. 1989) ("[W]e must look at each act of speech separately to
see whether it touched upon a matter of public concern"). Ra-
ther than examining all thirteen of Inendino's posts individu-
ally, the court discussed the contents of a few before conclud-
ing that they as a group failed to touch on matters of public
concern. *See Inendino v. Nance-Holt*, 753 F. Supp. 3d 641, 648
(N.D. Ill. 2024).

Second, it appears that, in the district court's view, the pa-
tently offensive nature of the posts cuts against their ability to
address matters of public concern (or, at least, rendered them

less likely to do so). *See, e.g., id.* at 647 ("The Court is skeptical that Inendino's speech offers any value to society or to the public at large on any topic. Indeed, the Court is hard-pressed to find the value from the comment 'aim for the torso!!!' regarding a video from a shooting that left two men dead."). This impulse is understandable, but, in *Snyder*, the Supreme Court cautioned, "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" 562 U.S. at 453 (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

Third, the district court appeared to believe that a public employee's speech cannot relate to a matter of public concern if it expresses "a personal grievance." *See Inendino*, 753 F. Supp. 3d at 647–48 (writing that "it is difficult to see how a photograph of Mayor Lightfoot in a restaurant with the caption, '[h]ope she chokes on something,' concerns anyone other than Inendino and his personal grievances"). In the past, we have employed the term "personal grievance" to describe a type of employee speech related to conditions of employment that does not implicate matters of public concern. *See Kilborn*, 131 F.4th at 559; *Dishnow*, 77 F.3d at 197.

But just because Inendino was employed as a firefighter for CFD—a department under the mayor's authority—does not automatically limit his speech to an employee grievance. [5] For example, Inendino's comments here can be read to con-

---

[5] Rather than "personal grievance," the Supreme Court used the phrase "employee grievance" in *Connick*. 461 U.S. at 154. There, "employee grievance" referred to a very specific type of speech—speech related solely to the public employee's terms and conditions of employment. *See id.* at 141 (addressing employee's questionnaire distributed to other employees

vey a personal dislike for the former mayor as mayor (and not only as his employer). Such critiques of public officials, no matter how inarticulate and base, must be zealously guarded because it "is at the heart of the First Amendment's right of free speech." *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964)).

Fourth, the district court did not adequately consider the forum of the posts—a public page on Facebook. It goes without saying that Facebook is a widely-used social media platform that "ha[s] gone from unheard-of to inescapable." *Krasno v. Mnookin*, 148 F.4th 465, 472 (7th Cir. 2025) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024)). Additionally, unlike certain other social media platforms, Facebook is a forum that hosts lively public debate on issues of the day. *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) ("On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos."). This is particularly true of public Facebook pages, where "*anyone* could see and comment on [one's] posts," *Lindke v. Freed*, 601 U.S. 187, 191 (2024), and a user can reach "as broad a public audience as possible," *Snyder*, 562 U.S. at 454. The significant role Facebook plays in public discourse further supports the conclusion that Inendino's posts touch on matters of public concern.

Even under the correct standard, however, there may be room for debate as to whether Inendino's Facebook posts ad-

---

"concerning office transfer policy, office morale, [and] the need for a grievance committee"); *see also Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000) ("[A]ll of the questioned speech took place within the employer's personnel hierarchy and concerned the management of the labor force.").

dressed matters of public concern. Given their form, content, and context, there are substantial arguments to be made that Inendino's posts, while hateful and feckless, raised matters of public concern because they arise, at least in part, from a particular view of current newsworthy events and government policies.

Due to the offensive and racist nature of Inendino's posts, we are reluctant to amplify them here. Suffice it to say we have reviewed all thirteen of them and, because we will assume for present purposes that all thirteen addressed matters of public concern, we offer only a couple to illustrate our point.

First, take the following post:



This post addresses events surrounding the death of Breonna Taylor. Inendino wrote: "Just another reason for the animals

to go get some free shit." Although racist and offensive, this post can be read to express Inendino's views on BLM's response to the death of Taylor, which received national coverage at the time.

Next consider:



This is a reposted audio recording of a phone call involving then-Mayor Lori Lightfoot. The post is accompanied by a picture of her at a podium. Inendino added the caption, "Like I said you could take one out of the ghetto but can't take the ghetto out of them … what a dirty hoodrat she is."

Inendino made this post on June 9, 2020, commenting on a heated conference call between Lightfoot and a Chicago alderman regarding the BLM protests. His comment, although

racist and crude, can be seen as a critique of the mayor's efforts to address the ongoing protests.

Finally, consider:



This post is a meme that reads, "All Lives Splatter" and "Nobody Cares About Your Protest Keep Your Ass Out of the Road." The meme includes a cartoon car running over three stick people. The post is racist and offensive but can be construed to reflect Inendino's disapproval of the BLM protests. *See Noble v. Cincinnati & Hamilton Cnty. Pub. Library*, 112 F.4th 373, 381–82 (6th Cir. 2024) (concluding this meme to address matters of public concern).

Similar arguments can be made for all thirteen Facebook posts. Because we agree with the district court's ultimate conclusion, however, we will assume that each of Inendino's

posts passes muster under *Connick* and proceed to *Pickering* balancing.

## B. *Pickering* Balancing

The *Pickering* analysis provides a means "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. In determining whether the balance favors the employee's speech or the government's interest in efficiency, we consider the following factors:

> (1) [W]hether the speech would create problems in maintaining discipline or harmony among co-workers;
>
> (2) whether the employment relationship is one in which personal loyalty and confidence are necessary;
>
> (3) whether the speech impeded the employee's ability to perform her responsibilities;
>
> (4) the time, place, and manner of the speech;
>
> (5) the context in which the underlying dispute arose;
>
> (6) whether the matter was one on which debate was vital to informed decisionmaking; and,
>
> (7) whether the speaker should be regarded as a member of the general public.

*Hedgepeth*, 152 F.4th at 796 (quoting *Kristofek*, 832 F.3d at 796) (alteration in original).

We need not address each and every factor, *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025), nor do we simply count up the number of factors that favor each side to reach a conclusion, *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013). "Rather than marching through the list" we "focus on the specific considerations that bear weight in evaluating the competing interests in the specific context of this case." *Darlingh*, 142 F.4th at 566. Furthermore, we keep in mind that, although *Pickering* balance is a question of law, *id.* at 564 (citing *Harnishfeger*, 943 F.3d at 1113), it is "inherently fact-dependent," *Beathard v. Lyons*, 129 F.4th 1027, 1035 (7th Cir. 2025).

Under *Pickering*, "the employer bears the burden of showing that its interest in workplace efficiency outweighs the employee's right to speak." *Hedgepeth*, 152 F.4th at 795 (citing *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1118 (7th Cir. 2013)). And, when a public employer moves for summary judgment, the employer "must lay out the elements of the [defense], cite the facts which it believes satisfy these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the defense." *Harnishfeger*, 943 F.3d at 1116 (citation modified). The employer cannot rely on *post hoc* rationalizations. *Id.* Instead, we must consider "what the public employer's concerns really were" at the time. *Id.* (citation modified).

Here, the City fired Inendino because of his thirteen Facebook posts. In Commissioner Nance-Holt's view, the Facebook posts (1) negatively impacted CFD's image and reputation; (2) sowed discord within the CFD; and (3) undermined the public's faith and trust that its members will respond to and treat all citizens of Chicago equally, regardless of their race.

We begin with the first *Pickering* factor (the second of Nance-Holt's three reasons)—the need to maintain "harmony among coworkers." *Pickering*, 391 U.S. at 570. To start, we recognize that workplace collegiality is especially important for first responders. *See Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir. 1979) ("When lives may be at stake in a fire, an Esprit de corps is essential to the success of the joint endeavor."). And the City argues that CFD reasonably believed that Inendino's posts would cause discord among the rank-and-file. But, as Inendino points out, none of his co-workers ever complained about his posts or the views they expressed.

In response, the City notes that it need not show actual workplace disruption; a *threat* of disruption is sufficient, so long as the threat is reasonable and not conclusory. *See Schneiter v. Carr*, 148 F.4th 438, 449 (7th Cir. 2025) ("[A] showing of actual disruption is not required; a public employer may act based on potential disruption so long as its predictions are reasonable.") (citation modified); *see also Greer v. Amesqua*, 212 F.3d 358, 372 (7th Cir. 2000) ("Although [the public employee] protests that his news release did not ignite actual disruption in his workplace, an employer need not establish actual disruption before disciplining an employee when the threat of future disruption is obvious."); *Gustafson II*, 290 F.3d at 911 ("Mere assertions of a generalized potential for disruption are … insufficient.") (citation omitted). The problem is that, here, the City does not offer any evidence that demonstrates a disruption or even a reasonable threat of a disruption. Indeed, twenty months passed between Inendino's final Facebook post and the City's decision to fire him. During that time, no coworker complained about Inendino or his posts.

The City cites *Schneiter*, but that case is markedly different. There, the plaintiff-employee worked as a deputy-warden for his state's department of corrections. 148 F.4th at 440. One day he posted five internet memes "touching on issues of race, religion, and gay rights in particularly inflammatory and degrading ways." *Id.* at 441. A local newspaper eventually saw the posts and published an article with the headline "Deputy Prison Warden Posts Facebook Meme that Compares Muslim Children to Garbage." *Id.* at 443. The day the article ran, the plaintiff was placed on paid administrative leave. *Id.* We explained that by placing the plaintiff on administrative leave "soon after discovering the Facebook posts, the Department may have prevented a disruptive reaction in its correctional facilities." *Id.* at 449; *see Weicherding v. Riegel*, 160 F.3d 1139, 1143 (7th Cir. 1998) (observing that the expeditious suspension of an employee likely avoided racially motivated disruption).

Here, the passage of twenty months without incident undermines the reasonableness of the Commissioner's concerns about potential workplace disruption. *Gustafson II*, 290 F.3d at 911 ("[W]here … substantial time has passed without incident, it naturally becomes more difficult for an employer to satisfy its burden of proving that punishment on the basis of anticipated disruption was reasonable."). True, Casey testified during his deposition that CPD employees "come from all different backgrounds." But, given the lack of complaints over the course of nearly two years, this statement alone is not enough to show that CFD's concern about workplace discord was reasonable.

To be clear, this is not to say that actual workplace complaints or disruption is necessary before a public employer

can act. *See Schneiter*, 148 F.4th at 449. But more is needed than a general observation about the make-up of the workforce. For example, the public employer might offer the testimony of a seasoned supervisor to attest from personal experience about the detrimental impact that racist statements have on the ability of CFD firefighters to do their work. Or the employer might present testimony from a qualified social science expert about the harmful effects of racism in workplaces like CFD. But, here, the record lacks any meaningful evidence to substantiate the City's concerns about workplace disruption. Thus, the first *Pickering* factor favors Inendino. The remaining factors, however, weigh heavily against him.

Take the fourth factor (the time, place, and manner of the speech). First, the fact that Inendino did not direct his comments to a particular audience but uploaded his posts indiscriminately for the world to see cuts against him. *See Hicks*, 109 F.4th at 903. As does the extremely derogatory and divisive content of the posts. *See id.* (factor favored employer because "the derogatory language and images [the employee] used did more than necessary to contribute to the conversation"); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792 (7th Cir. 2015) (factor favored employer because the employee "aggressively lambasted" and "ridiculed" protestors "going far beyond what was necessary to communicate his displeasure with their methods").

The seventh *Pickering* factor (whether the speaker should be regarded as a member of the general public) also favors the City. Inendino went out of his way to identify himself as a CFD firefighter on his public Facebook page, and his profile picture depicted him (and his son) wearing CFD firefighter gear while sitting on the back of a fire truck. Given this, it is

unreasonable to think that viewers would regard him simply as a member of the general public. *See Lalowski*, 789 F.3d at 792–93 (an off-duty police officer did not speak as a member of the general public where he "made sure the [audience] remembered him as a police officer"); *cf. Coady v. Steil*, 187 F.3d 727, 733 (7th Cir. 1999) (an off-duty firefighter who displayed a political sign on his car was not "speaking as a firefighter" where "there was apparently nothing on [his] car which identified him as a firefighter").

Similarly, the third factor (whether the speech impeded the employee's ability to perform his responsibilities) weighs substantially in the City's favor. It is beyond reasonable debate that the CFD has a strong interest in maintaining public confidence in its services. *Schneiter*, 148 F.4th at 449 ("A public employer's reputational interests are a valid part of the balancing inquiry."). Furthermore, we have emphasized that "*Pickering* caselaw gives special solicitude to public employers in the law-enforcement and correctional contexts because safety and order are of paramount concern." *Id.* at 448 (citation modified). This is because they "function as paramilitary organizations charged with maintaining public safety and order." *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999). The same reasoning applies to fire departments and firefighters. *See Locurto v. Giuliani*, 447 F.3d 159, 178–79 (2d Cir. 2006) ("Police officers and firefighters alike are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that police officers and firefighters accord the members of that community.").

Here, Inendino served as a firefighter and EMT in Englewood, a predominantly Black neighborhood in Chicago. His

job was to provide lifesaving care to all who sought it. As a colleague at the Englewood station explained, EMTs are "normally first on scene, before the ambulance" and "tend to the patient depending on the nature of the call." Dkt. 52-3 at 4. Once there, they "tak[e] care of the patients medically, a lot of times emotionally, sometimes holding hands of the … family members." *Id.* Based on these job duties, the City's concern that Inendino's racially-charged posts might reflect an unwillingness to treat all citizens of Chicago equally, regardless of race, was reasonable. *See Lalowski*, 789 F.3d at 792 ("By attacking private citizens with profane and disrespectful language," the public employee "compromised the community's trust in its" public safety workers, "thus failing in one of his most important duties.").

But that is not all. Not only did Inendino's posts manifest a deep disrespect for certain racial groups, they targeted one of the very groups that Inendino was supposed to serve at his assigned station. In this way, this case is reminiscent of our decision in *Craig*, 736 F.3d at 1119. There, the plaintiff, a male counselor at a public high school, self-published a book of advice for women entitled, "It's Her Fault." *Id.* at 1113–14. While some of the advice was mundane, much of it was sexually explicit. *Id.* at 1114. The plaintiff was fired after community members complained about the book to the school board. *Id.* at 1115. In concluding that the *Pickering* balance favored the school district, we emphasized that the school district's "assessment of how [the plaintiff]'s students, and particularly his female students, would respond upon reading or hearing about the hypersexualized content of his book loom[ed] large in our analysis." *Id.* at 1119.

Firefighters too occupy a place of immense trust and authority. Residents place their faith in firefighters, often without question, because they believe these dedicated public servants will come to their aid without fear or favor. By posting disparaging remarks of Black people, Inendino undermined that trust by demonstrating that he, though a firefighter, did not view all residents as equals but rather looked upon certain communities with racial disdain. Moreover, his posts not only damaged the public's view of his willingness to serve all residents equally but also eroded the public's trust in the CFD as a whole, a trust that is vital to the department's effectiveness and success. *See Grutzmacher v. Howard County*, 851 F.3d 332, 346 (4th Cir. 2017) ("The more the employee's job requires public contact, the greater the state's interest in firing her for expression that offends her employer.") (citation modified). As such, the third *Pickering* factor weighs decidedly in the City's favor.

To sum up, on one side of the *Pickering* scale lies Inendino's interest in uploading the thirteen Facebook posts, which, we assume, addressed matters of public concern. On the other side of the scale, we have the racially offensive content of those posts, Inendino's decision to identify himself prominently as a Chicago firefighter on Facebook, his indiscriminate dissemination of the posts, Inendino's targeting of groups that his position requires him to protect, and the unique position of community trust that the CFD must maintain to achieve its public safety mandate. On balance, we conclude that the City's interests in ensuring that the CFD succeeds in performing its public safety mission substantially outweigh Inendino's interest in posting the contested memes and comments on Facebook.

\*        \*        \*

For these reasons, we affirm the district court's grant of summary judgment in favor of the City.